**FILED**

SEP 3 0 2003

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA

### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ALABAMA
### NORTHEASTERN DIVISION

| | | |
|---|---|---|
| STEPHEN E. HOLLICH, | } | |
| | } | |
| Plaintiff, | } | |
| | } | |
| v. | } | CASE NO. CV 99-3431-NE |
| | } | |
| SEAN O'KEEFE, Administrator, National | } | |
| Aeronautics and Space Administration,[1] | } | |
| | } | **ENTERED** |
| Defendant. | } | OCT - 2 2003 |

### MEMORANDUM OPINION

In this opinion, the court explains its reasons for its February 2, 2001 and March 29,

2002, Orders granting the Motion to Dismiss Counts Three, Four, Seven, Eight, and Twelve of

the Complaint and First Amended Complaint and the  Motion to Dismiss Counts Nine and

Eleven and for Summary Judgment on Counts Two, Five, Six, and Ten, filed by the

Administrator of the National Aeronautics and Space Administration ("defendant" or "NASA").

Plaintiff Stephen E. Hollich ("plaintiff" or "Hollich"), a retired GS level 13 Aerospace Engineer,

asserts claims of age-based discrimination and reprisal against defendant under Title VII of the

Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), the Age

Discrimination in Employment Act of 1967, as amended, 29 U.S.C. § 621, *et. seq.* ("ADEA").

Plaintiff specifically claims that by not selecting him for three separate GS level 14 positions at

its George C. Marshall Space Flight Center ("MSFC") defendant discriminated against him on

the basis of age, retaliated against him for protected activity, and breached a settlement

---

[1] On December 21, 2001, Sean O'Keefe became Administrator of the National Aeronautics and
Space Administration.  Therefore, pursuant to Rule 25(d)(1) of the Federal Rules of Civil
Procedure, O'Keefe is substituted for Daniel S. Goldin as the proper defendant in this case.

78

agreement. (*See* Am. Compl.)  Upon consideration of the record, the submission of the parties,

the arguments of counsel, and the relevant law, the court is of the opinion that defendant's

motions were properly granted.

## I. FACTUAL SUMMARY

Plaintiff was born September 11, 1932.  (PX A-1.)[2]  He has a Bachelor of Science degree

in electrical engineering and a Masters degree in Business Administration.  (PX A-1.)  He has

also completed course work toward a Doctorate degree in Management and Human Relations.

(PX A-1.)  Plaintiff began working as an aerospace engineer in 1960.  (PX A-1.)  Plaintiff has

worked in approximately thirteen engineering jobs in Huntsville from 1963 through 1990.  (PX

A-1.)  He has been employed at various times by NASA at MSFC and at other times by

contractors providing engineering services to MSFC.  (PX A-1.)

In 1981, plaintiff began working for a NASA Safety Office at MSFC as a flight systems

safety engineer.  (PX A-2.)  In March 1985, plaintiff left the Safety Office to work as the safety

person on the Space Station project.  (PX A-2.)  In 1988, plaintiff was transferred to the

Materials Selection and Control Office.  (PX A-2.)  In 1988, plaintiff was assigned to work in a

laboratory and testing engineering position.  (PX A-2.)  In 1990, plaintiff worked as Technical

Lead on a project with the Contamination Control Laboratory at MSFC.  (PX A-2.)  Beginning

--------------------------------------------------

[2] Defendant's Submission of Evidence in Support of Defendant's Motion to Dismiss Counts Nine and Eleven and for Summary Judgment on Counts Two, Five, Six, and Ten is referred to as "DX" followed by the corresponding tab letter.  Plaintiff's Evidentiary Submission in Opposition to Defendant's Motion to Dismiss and for Summary Judgment is referred to as "PX" followed by the corresponding tab letter and numeral.  Defendant's Supplemental Submission of Evidence is referred to as "DX2," followed by the corresponding tab letter.

on February 21, 1993, plaintiff worked as an "AST, Experimental Manufacturing Techniques" at MSFC. (PX A-2; Hatfield Decl., Ex. C at 2.)

Prior to August 1994, plaintiff had engaged in EEO activity against NASA, including filing formal complaints and district court actions against NASA as a result of employment disputes. (PX A-2.) There is evidence that Hollich filed three prior lawsuits against defendant in the United States District Court for the Northern District of Alabama alleging claims of employment discrimination. (*See* DX O, P, Q, R.)

On August 8, 1994, defendant issued MSFC Vacancy Announcement CPP-94-35-PL announcing a job opening for the position of AST, Reliability & Quality Assurance, GS-861-14 ("Position 1"). (PX I-1.) The duties of Position 1 include "[s]erv[ing] as safety, reliability, maintainability, and quality assurance (SRM&QA) technical authority responsible for all aspects of SRM&QA within the Observatory Projects Office" and "[p]roviding technical direction and monitor[ing] the activities of 10-20 engineers and technicians performing SRM&QA functions." (DX I at 1.) James E. Hatfield, Jr. ("Hatfield"), served as the selecting official for this position. (Hatfield Decl. ¶ 2.) Five applicants, including plaintiff, were eligible for Position 1. (*Id.*)

Hatfield interviewed each applicant. (Hatfield Decl. ¶ 4.) Hatfield testified that he "did not know Mr. Hollich prior to meeting him at the interview for this position." (*Id.* ¶ 3.) Hatfield also testified that he "was not aware of Mr. Hollich's prior EEO activity at the time of this selection." (*Id.*) According to Hatfield, based on his interview with Hollich, he concluded that Hollich "did not know what the position required." (*Id.* ¶ 6.) Hatfield concluded that "[t]he experience described by Mr. Hollich during his interview was not related to the type of work required by this position." (*Id.*) According to Hatfield, during the interview, Hollich claimed

3

that he had worked on the Tethered Satellite System. (*Id.* ¶ 7.) Hatfield testified that since he himself supervised the person in charge of that project he "was surprised that Mr. Hollich could have been involved in that project without [Hatfield's] knowledge." (*Id.*) Hatfield testified that after the interview the person in charge of the Tethered Satellite System indicated that Hollich did not work on that project. (*Id.*) Hatfield testified that he "was disturbed by [Hollich's] lack of candor." (*Id.*)

Hatfield selected Alan Clark ("Clark") for Position 1. (*Id.* ¶ 5.) Hatfield testified that he "felt that Mr. Clark was the best applicant for this position because of his Quality experience, his team leadership experience, and his experience interfacing with government contractors." (*Id.*) Hatfield also found Clark's "extensive knowledge of the Advanced X-ray Astrophysics Facility" desirable because it "directly related to the position at issue." (*Id.*) Hatfield testified that prior to his selection, Clark had been "performing essentially the same tasks required of this position at a lower grade level." (*Id.*) According to Hatfield, "Clark was the most qualified applicant for this position." (*Id.*) When Hatfield selected Clark for the position, he advised his supervisor, Mr. James Ehl ("Ehl"), of the decision. (*Id.* ¶ 13.) Ehl concurred in the decision. (*Id.*) Hatfield testified that "[t]o the best of [his] knowledge and recollection, Mr. Ehl did not reference Mr. Hollich's prior EEO activity during [their] conversation concerning [his] selection of Mr. Clark." (*Id.*) Ehl testified that he has "no recollection of discussing Mr. Stephen Hollich's prior EEO activity with Mr. Hatfield at any time prior to Mr. Clark's selection." (Ehl Decl. ¶ 2.)

On August 19, 1994, defendant issued MSFC Vacancy Announcement CPP 94-75-CV announcing a job opening for the position of Supervisory AST, Reliability & Quality Assurance, GS/GM-861-14 ("Position 2"). (PX I-36.) The duties of Position 2 include "[s]erv[ing] as a

4

technical advisor and consultant, and as Director, Payload Assurance Office, Safety and Mission Assurance (S&MA) Office," "[p]rovid[ing] technical direction and manag[ing] the activities of engineers and technicians performing safety, reliability, maintainability, and quality assurance functions for the Payload Projects Office at MSFC, contractor facilities, and other NASA centers," and "[s]upervis[ing] co-located lead engineers who serve as S&MA experts for payload projects." (*Id.*) Ehl served as the selecting official for this position. (Ehl Decl. ¶ 2.) The announcement states that "[a]pplications must be received in the Personnel Office by 4:30 p.m. on the closing date" (PX I-37), which according to the announcement was August 26, 1994. (PX I-36.)

Camille Velvet was the Personnel Management Specialist in the Human Resources Department assigned to staff this announcement. (Velvet Decl. ¶¶ 1, 2.) Velvet was on leave from the office from August 22 through September 6, 1994. (*Id.* ¶ 4.) During Velvet's absence, Kevin Plank, another Personnel Management Specialist performed the staffing duties for this announcement. (DX F at 30, 31; Plank Decl. ¶ 2.)

Plaintiff testified that on the closing date "close to the closing hour" he took his application to Velvet's office in the Personnel Office, but found her door closed and locked. (PX B-8 at 40-41.) Plaintiff testified that he then took the application a few doors down the hall to the next open door where he spoke with Andrea Bone. (*Id.* at 41, 42.) Plaintiff testified that he asked her if she would accept his application, and Bone told him "that she would pass it on to

Ms. Velvet."[3]  (*Id.* at 42-43.)  According to plaintiff, he "handed Andrea Bone [his application]."
(*Id.* at 39.)

Andrea Bone Tobias ("Bone") testified that she worked as a clerical assistant in the
Personnel Office's External Recruiting Branch at MSFC in 1994.  (Bone Decl. ¶ 1.)  Bone
testified that she does not know Hollich and was not aware of his prior EEO activity at the time
that Position 2 was being filled.  (*Id.* ¶ 2.)  Bone also testified that "during the time [she] worked
as a clerical assistant in the External Recruiting Office, to the best of [her] knowledge and belief,
no one left a CPP application in [her] box."  (*Id.* ¶ 4.)  There is no evidence that Bone denied that
Hollich handed her his application for Position 2 on August 26, 1994.

On or about September 2, 1994, approximately one week after the announcement's
closing date, Venita Robinson,[4] a Personnel Staffing Specialist in the MSFC Personnel Office's
External Recruiting Branch, found plaintiff's application[5] for Position 2 in a stack of applications
from external applicants, non-NASA employees.  (DX G at 14, 26; Robinson Decl. ¶ 3, Ex. A.)
Robinson took the application to Plank's office, but Plank was not present.  (DX G at 36-37;
Robinson Decl., Ex. A.)  At Jim Bramblett's suggestion, Robinson left a note for Plank and
Velvet explaining that she had found plaintiff's application for Position 2.  (DX G at 36, 38;
Robinson Decl., Ex. A.)  On September 6, 1994, Plank stopped by Robinson's office and told her

---

[3] Plank testified that when a personnel specialist for a particular job announcement is absent an
application may be left with another personnel specialist.  (PX D-8 at 29, D-9 at 30.)

[4] Robinson testified that she does not know Hollich, and was not aware of Hollich's EEO activity
in August and September 1994.  (Robinson Decl. ¶ 1.)

[5] Plaintiff's application for Position 2 is neither signed nor dated.  (DX B at 48; *see* Plank Decl.,
Ex. C at 622.)

that he had already issued a certificate and that the selection had been made.  (Robinson Decl., Ex. A; Plank Decl. ¶ 4.)

Plank testified that by the time the announcement closed on August 26, 1994, he had received applications from only two applicants, Charles Shivers and Richard Siler.  (Plank Decl. ¶ 2.)  On August 29, 1994, Plank issued a promotion certificate, which "identifies qualified candidates . . . who applied . . . for this position," listing Shivers and Siler.  (*Id.* ¶ 3, Ex. A.) Plank testified that he did not have and was not aware of plaintiff's application when he issued the Promotion Certificate.[6]  (*Id.* ¶ 2; DX F at 65.)  On August 31, 1994, Ehl, the selecting official, selected Shivers for the job.  (Ehl Decl. ¶ 2.)  Ehl testified that prior to selecting Shivers, Ehl was not aware that Hollich had submitted an application for the position.  (*Id.* ¶ 4.)

Plaintiff testified that he contacted Velvet to check on the status of the position and was informed that she never received his application for Position 2.  (DX B at 44.)  On November 15, 1994, Frank Bynum,[7] who was at that time the Director of the Personnel Office, sent plaintiff a letter stating that plaintiff's application was not considered because it did not reach Velvet until after the vacancy was filled.  (Plank Decl., Ex. B.)  In response to plaintiff's reply, on December 8, 1994, Bynum sent plaintiff another letter[8] notifying him that because there could have been an error in the processing of plaintiff's application for Position 2, plaintiff would "be afforded priority consideration for the next vacancy of AST, Reliability and Quality Assurance, GS/GM-861-14."  (DX2, Ex. A; *see* DX J ¶ 10.)  In the letter, Bynum stated that "[p]riority consideration

---

[6] Plank testified that he was aware that plaintiff had engaged in prior EEO activity prior to the fall of 1994.  (PX D-3 at 7, 8.)

[7] Bynum testified that at this time he knew of Hollich's previous EEO activity.  (PX S-4.)

[8] Plaintiff received Bynum's letter on or about December 11, 1994.  (DX J ¶ 11.)

occurs when an employee receives a referral to the selecting official before other candidates are considered under competitive procedures." (DX2, Ex. A; DX J ¶ 12.) Bynum informed plaintiff that he would receive priority consideration in accordance with Section 202.2 of NASA Handbook 3335.1C.[9] (DX2 Ex. A.)

On June 22, 1995, Victoria J. Crawford, then Chief, Personnel Management Division, directed Ehl to give plaintiff priority consideration for a position ("Position 3") for which he served as selecting official. (PX I-44; *see* DX M.) Crawford told Ehl that "Hollich lost consideration through no fault of his own and meets the qualification standards for your vacancy." (*Id.*) Crawford advised Ehl that Rita Evans-McCoy would make "Hollich's Official Personnel Folder available for [his] review." (*Id.*)

---

[9] That provision provides, in full:

Correction of Procedural Error

a.   An employee who was not afforded proper consideration due to a procedural error in a previous competitive placement action must be given priority consideration for the next appropriate (i.e., similar) vacancy filled under this Plan. "Appropriate vacancy" is defined in Appendix C, page C-2.

b.   Priority consideration means that the employee must be referred to the selecting official for consideration before other candidates are considered under these competitive procedures. If selected on the basis of the priority consideration, the employee may be promoted or reassigned as an exception to the competitive procedures of this Plan.

c.   When an employee is referred for priority consideration but is not selected, this decision must be documented in the Competitive Placement Record.

(PX I-35.)

Ehl testified that on June 26, 1995, he considered Hollich for the Position 3[10] before the position was announced and before considering anyone else. (PX E-6 at 18, E–8 at 28.) Ehl's contemporaneous notes from viewing plaintiff's Official Personnel Folder (also known as an Official Personnel File or a 201 File) were as follows:

- Mr. Hollich was a GS-12 at the time he worked in Safety Office.  Promoted to GS-13 on February 17, 1985.  Has no experience at 13 level on any Safety aspects since he was reassigned to S&E at that time.

- Mr. Hollich's performance was essentially satisfactory while working in the Safety Office.

- Experience disclosed in 201 file has marginal application to positions announced.

- Mr. Hollich has free-flying experience only.  Has no tether experience.[11]

- Mr. Hollich has no experience in Space Shuttle flight readiness process including launch countdown support.

(PX I-79.) Ehl completed the Priority Consideration supervisory statement electing not to select plaintiff for the vacant position on June 26, 1995. (PX I-75.)

On August 4, 1995, defendant issued MSFC Vacancy Announcement CPP-95-63-RE announcing an opening for Position 3, the position of AST, Reliability and Quality Assurance, GS-861-14.  (PX I-45.)  The position's duties included serving as "technical expert and authority on tethered space flight systems. . . ."  (*Id.*)  Efforts to fill the position were ongoing at least through September 13, 1995.  (*See* PX I-76.)  Subsequently, Position 3 was cancelled

---

[10] Ehl testified that Position 3 is the position announced in CPP 95-63-RE.  (PX E-8 at 28.)

[11] One of this position's duties is "serv[ing] as technical expert and authority on tethered space flight systems."  (PX I-45.)  During discovery, defendant asked plaintiff to produce documentation of his tether experience and his experience in the Space Shuttle flight readiness process including launch countdown support.  (DX B, Ex. 4 ¶ 6.)  Plaintiff produced no documents to document tether experience.  (*Id.* at Req. Produc. No. 6.)

9

"since the needed tethered payload system safety expertise may not be required following the February 1996 flight of STS-75. No follow-on tethered satellite missions have been identified."[12] (PX I-78; DX J ¶ 4.) No one was selected to fill Position 3. (DX J ¶ 5.) Plaintiff retired from NASA MSFC effective January 2, 1999. (PX B-2 at 6- 7.)

Plaintiff filed suit against defendant alleging twelve counts arising out of these events. (*See* Am. Compl.) Plaintiff alleges that his non-selection for Position 1 resulted from age discrimination in Count One and reprisal in Count Two. (*Id.* ¶¶ 32-37.) Plaintiff alleges that his non-selection for Position 2 resulted from age discrimination in Count Five and reprisal in Count Six. (*Id.* ¶¶ 44-48.) Plaintiff alleges that his non-selection for Position 3 resulted from breach of settlement in Count Nine, reprisal in Count Ten, and failure to afford him priority consideration in Count Eleven. (*Id.* ¶¶ 55-60.) Plaintiff alleges that defendant's failure to issue timely Final Agency Decisions concerning his complaints of non-selection for Positions 1 and 2 constitutes reprisal (Counts Three and Seven) and violates 29 C.F.R. § 1614.110 (Counts Four and Eight). (*Id.* ¶¶ 38-43, 49-54.) In Count Twelve, plaintiff seeks a declaratory judgment declaring that defendant has violated 29 C.F.R. § 1614.110. (*Id.* ¶¶ 64-67.)

## II. MOTION TO DISMISS COUNTS 3, 4, 7, 8, AND 12

The sole bases for jurisdiction alleged by plaintiff are 28 U.S.C. § 1331, "42 U.S.C. § 2000, *et seq.*, 29 U.S.C. § 633a, and applicable regulations including specifically 29 C.F.R. [§] 1614.103, and 29 C.F.R. [§] 1614.101." (Am. Compl. ¶¶ 2, 3.) Counts Three, Four, Seven, Eight, and Twelve concern defendant's alleged failure to issue timely Final Agency Decisions concerning EEO complaints. (*See* Am. Compl. ¶¶ 38-43, 49-54, 67-67.) In Counts Three and

---

[12] Plaintiff identifies no evidence to the contrary. (DX B, Ex. 2 ¶ 10.)

10

Seven, plaintiff alleges that defendant's failure to issue timely Final Agency Decisions for plaintiff's complaints arising out of his non-selection for Positions 1 and 2 "constitute[] further reprisal action against Plaintiff for engaging in prior protected activity." (Am. Compl. ¶¶ 38-40, 49-51.) In Counts Four and Eight, plaintiff alleges that he has been damaged by defendant's failure to issue timely Final Agency Decisions in violation of 29 C.F.R. § 1614.110. (*Id.* ¶¶ 41-43, 52-54.) In Count Twelve plaintiff seeks a declaratory judgment declaring that defendant has violated 29 C.F.R. § 1614.110. Defendant contends that these counts should be dismissed pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure for lack of subject matter jurisdiction. The court agrees.

A case should be dismissed if the court lacks subject matter jurisdiction over the action. FED. R. CIV. P. 12(b)(1). "Federal courts are courts of limited jurisdiction," possessing only as much adjudicative power as is authorized by the Constitution and statute. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). Plaintiff alleges that jurisdiction exists under 28 U.S.C. § 1331, which provides that "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." "Federal district courts have original jurisdiction of all civil actions that arise under the Constitution or laws of the United States." *City of Huntsville v. City of Madison*, 24 F.3d 169, 171 (11th Cir. 1994) (citing 28 U.S.C. § 1331). "Federal question jurisdiction may be based on a civil action alleging a violation of the United States Constitution . . . or a federal cause of action established by a Congressionally-created express or implied private remedy for violation of a federal statute." *City of Huntsville*, 24 F.3d at 171-72 (citing *Merrell Dow Pharmaceuticals, Inc. v. Thompson*, 478 U.S. 804, 809 (1986)).

Federal regulation imposes on federal agencies the duty of making Final Agency Decisions with respect to EO complaints.  42 U.S.C. § 2000e-16(b) gives the EEOC the power to "issue such rules, regulations, orders and instructions as it deems necessary and appropriate to carry out its responsibilities under this section" including enforcing section (a)'s prohibition on employment discrimination in federal agencies. .  Furthermore, federal agencies must comply with the rules issued by the EEOC.  *Id.*  Acting pursuant to this authority, the EEOC imposes upon federal agencies the duty to "take final action" with respect to EO complaints.  *See* 29 C.F.R. § 1614.110.  Although defendant is under a duty to comply with this regulation, there is no indication that Congress created either expressly or by implication a private remedy for defendant's alleged failure to issue a Final Agency Decision.  Because without a federally-created private remedy there can be no federal cause of action, Counts Three, Four, Seven, Eight and Twelve are due to be dismissed for lack of subject matter jurisdiction.[13]

### III.  MOTION TO DISMISS COUNTS NINE AND ELEVEN AND FOR SUMMARY JUDGMENT ON COUNTS TWO, FIVE, SIX, AND TEN

Defendant filed a Motion to Dismiss Counts Nine and Eleven and for Summary Judgment on Counts Two, Five, Six, and Ten.   The court is of the opinion that defendant's motion is due to be granted.[14]

---

[13] Prior to the date set for argument on this motion, counsel for plaintiff informed the court that plaintiff was withdrawing his opposition to defendant's motion to dismiss counts 3, 4, 7, 8, and 12.

[14] Plaintiff concedes that Counts Two, Five, and Nine are due to be dismissed.  (Pl.'s Opp'n at 1.)

## A. Dismissal of Counts Nine and Eleven

In Count Nine, plaintiff alleges that he was not selected for Position 3 because of a "wrongful breach of settlement." (Am. Compl. ¶ 55.) In Count Eleven, plaintiff alleges that he was not selected for Position 3 because of defendant's "failure to afford him the requisite priority consideration promised him." (*Id.* ¶ 61.) Because there is no allegation of discrimination of any nature in either of these counts, plaintiff's asserted jurisdictional foundation, Title VII and the ADEA, provide no basis for subject matter jurisdiction over these claims. Plaintiff never sought to add additional bases of subject matter jurisdiction for these claims and has offered no statutory basis, even in argument, to support such claims.[15]

The burden of pleading and proving the subject matter jurisdiction of the court is on the plaintiff. *McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 189 (1936); *Reynolds v. Army and Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988). A plaintiff must show that the relief he requests is within a statutory waiver of sovereign immunity: "The United States, as sovereign, is immune from suit save as it consents to be sued . . . and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit." *United States v. Sherwood*, 312 U.S. 584, 586 (1941). S*ee also, United States v. Mitchell*, 445 U.S. 535, 538 (1980) (quoting *Sherwood*).

Waivers of sovereign immunity cannot be implied, but rather must be unequivocally expressed. *United States v. Mitchell*, 445 U.S. at 538 (quoting *United States v. King*, 395 U.S. 1, 4 (1969)). In addition, statutory waivers, "are to be construed strictly in favor of the sovereign." *McMahon v. United States*, 342 U.S. 25, 27 (1951). Unless sovereign immunity is explicitly

_____

[15] Plaintiff concedes that Count Nine is due to be dismissed. (Pl.'s Opp'n at 1.)

waived, or does not apply, it bars equitable as well as legal remedies against the United States. *See Army and Air Force Exch. Serv. v. Sheehan*, 456 U.S. 728, 734 (1982); *Malone v. Bowdoin*, 369 U.S. 643, 652 (1962). Thus, a party who brings a claim against a federal agency must identify the specific waiver of sovereign immunity that permits such a claim to be made.

Although plaintiff cites 28 U.S.C. § 1331 as a basis for subject matter jurisdiction (Am. Compl. at ¶ 2; Pl.'s Opp'n at 26), the former Fifth Circuit explained: "Section[] 1331 . . . may not be construed to constitute [a] waiver[] of the federal government's defense of sovereign immunity." *Beale v. Blount*, 461 F.2d 1133, 1138 (5th Cir. 1972).[16] *See A.L. Rowan & Son, Gen. Contractors, Inc. v. Department of HUD*, 611 F.2d 997, 1000 (5th Cir. 1980). Title VII and the ADEA waive sovereign immunity only for discrimination claims, not for claims of general mistreatment. *See* 42 U.S.C. § 2000e-16(a); 29 U.S.C. § 633a. Federal employees may not bring employment-related suits unless they fall within the Civil Service Reform Act or the statutes specifically waiving sovereign immunity for discrimination such as Title VII or the ADEA. *See Brown v. G.S.A.*, 425 U.S. 820, 835 (1976).

While Plaintiff also appears to contend that this case is a mixed case (Pl.'s Opp'n at 29),[17] he is in error. A mixed case is precisely defined by statute and regulation. Mixed cases are cases in which an employee has both "been affected by an action which [he] may appeal to the

---

[16] The Eleventh Circuit has adopted as binding precedent all decisions of the former Fifth Circuit rendered prior to October 1, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981).

[17] While not using the term "mixed case," plaintiff cites to 29 C.F.R. 1613.402(a) and 29 C.F.R. 1614.302(a). (Pl.'s Opp'n at 29.) Effective October 1992, Part 1613 of 29 C.F.R. was abolished and replaced with Part 1614. *See* 57 Fed.Reg. 12634. Thus, the first referenced regulation is invalid. However, the later cited regulation concerns "[m]ixed case complaints." 29 C.F.R. § 1614.302.

Merit Systems Protection Board ("MSPB")" and "alleges that a basis for the action was discrimination" prohibited under a federal anti-discrimination statute such as Title VII.  5 U.S.C. § 7702(a)(1)(A), (B).  Under 5 U.S.C. § 7512, specific actions are appealable to the MSPB.  Where a plaintiff appeals from a MSPB decision in a mixed case, the district court reviews discrimination claims *de novo* and non-discrimination claims on the administrative record under 5 U.S.C. § 7703(c).  *Holifield v. Reno*, 115 F.3d 1555, 1561 (11th Cir. 1997).  Plaintiff has presented no evidence that he pursued the claims asserted in these counts before the MSPB and he has not sought district court review pursuant to 5 U.S.C. § 7703.  He cites no precedent for this court to simply review and undo a federal employment decision based upon unsubstantiated allegations that it was done incorrectly.  Thus, Counts Nine and Eleven must be dismissed for lack of subject matter jurisdiction.

Additionally, Count Eleven is in the nature of a breach of promise claim.  Plaintiff asserts that NASA failed "to afford him the requisite priority consideration promised to him."  (Compl. at ¶ 61.)  Plaintiff has cited no basis for subject matter jurisdiction over a breach of promise claim by a federal employee against his federal employer.  Alternatively, should this be considered a breach of contract claim, the court does not have jurisdiction over a breach of contract claim because jurisdiction over such a claim would lie, if at all, in the Court of Claims. 28 U.S.C. § 1346(a)(2).

There is no basis for the court to conclude that there is subject matter jurisdiction over plaintiff's claim that NASA breached a settlement agreement with plaintiff or failed to afford him priority consideration as promised given the absence of allegations of discrimination.

Therefore, the claims raised in Counts Nine and Eleven should be dismissed for lack of subject matter jurisdiction. *See* FED. R. CIV. P. 12(b)(1).

## B. Summary Judgment Standard

Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The party asking for summary judgment bears the initial burden of showing that no genuine issues exist. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and show that there is a genuine issue for trial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the judge's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and therefore the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor. *See id.* at 255. Nevertheless, the nonmovant need not be given the benefit of every inference but only of every *reasonable* inference. *See Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## C. Counts Two, Six, and Ten

In Counts Two, Six, and Ten, plaintiff alleges that defendant's failure to promote him constituted retaliation for his prior participation in protected activity. To establish a prima facie

16

case of unlawful retaliation in violation of Title VII, plaintiff must show: (1) that he engaged in statutorily protected expression; (2) that he experienced an adverse employment action; and (3) a causal link between the protected expression and the adverse action. *See Sullivan v. Nat'l R.R. Passenger Corp.*, 170 F.3d 1056, 1059 (11th Cir. 1999) (citation omitted). Once a prima facie case has been established, the burden shifts to defendant to rebut the presumption of retaliation by producing legitimate, nonretaliatory reasons for the adverse action. *Id.* If defendant offers legitimate reasons for the employment action, the burden shifts back to plaintiff to show that defendant's proffered reasons were actually a pretext for prohibited retaliation. *Id.*

### 1. Count Two

In Count Two, plaintiff alleges that defendant did not select him for Position 1 in retaliation for plaintiff's prior engagement in protected activity. (Am. Compl. ¶¶ 35-37.) It is undisputed that plaintiff had engaged in prior protected activity and that plaintiff experienced an adverse employment action when he was not selected for Position 1, thereby establishing the first two elements of the prima facie case. Defendant contends that plaintiff cannot establish a causal connection between the protected activity and the adverse action, because Hatfield, who made the selection for Position 1, was not aware of plaintiff's prior protected activity. Hatfield testified that he was unaware of Hollich's prior EEO activity at the time of making the selection for Position 1. (Hatfield Decl. ¶ 3.) After selecting Clark for the position, Hatfield advised Ehl of his decision. (*Id.* ¶ 13.) Neither Hatfield nor Ehl recall having discussed Hollich's EEO activity prior to Hatfield's selection of Clark for Position 1. (*Id.* ¶ 3; Ehl Decl. ¶ 2.) Because plaintiff did not present any evidence that Hatfield, the decision-maker, was aware of his protected conduct, plaintiff has not presented sufficient evidence to permit a reasonable jury to

17

find the requisite causal connection between his protected activity and his non-selection for Position 1.  Because plaintiff has failed to present a prima facie case of retaliation as to his non-selection for Position 1, Count Two is due to be dismissed.[18]

### 2. Count Six

In Count Six, plaintiff alleges that he was not selected for Position 2 as a result of reprisal.  (Am. Compl. ¶ 46.)  In this selection, it is undisputed that plaintiff's application did not reach the selecting official before the selection.  Plaintiff contends that he can establish a causal connection between his EEO activity and his non-selection for Position 2 because "he can present a permissible inference that individuals with knowledge of his prior EEO activity intentionally mishandled his application so that he would not be considered eligible for [Position 2]."  (Pl.'s Opp'n at 10.)  Defendant maintains that plaintiff cannot establish a causal connection and cannot rebut its articulated reason for not selecting plaintiff:  "The selecting official did not have and was not aware of [plaintiff's] application."  (Def.'s Mem. at 22.)

Velvet, who was assigned to staff the announcement for Position 2, was away from the office on the closing date of the announcement.  (Velvet Decl. ¶¶ 2-4.)  During Velvet's absence, Plank actually determined which applicants were qualified, prepared the Promotion Certificate, and sent the Promotion Certificate to Ehl, the selecting official.  (DX F at 30-31; Plank Decl. ¶¶ 2, 3, Ex. A.)  Plank had received only two applications when the announcement closed, neither of which was plaintiff's.  (Plank Decl. ¶ 2.)  Plank sent the promotion certificate containing the names of the two qualified applicants to Ehl on August 29, 1994.  (Id. ¶ 3.)  Plank testified that he did not have and was not aware of plaintiff's application when he issued the promotion

_____

[18] Plaintiff does not oppose entry of summary judgment on Count Two.  (Pl.'s Opp'n at 1.)

certificate. (*Id.* ¶ 2; DX F at 65.) On August 31, 1994, Ehl selected Shivers, who was already working for Ehl at that time. (Ehl Decl. ¶ 2, Ex. B.) Ehl testified that prior to selecting Shivers, Ehl was not aware that Hollich had submitted an application for the position. (*Id.* ¶ 4.)

Plaintiff testified that on the closing date "close to the closing hour," finding Velvet's office door closed and locked, he took his application a few doors down the hall to the next open door where he spoke with Bone. (PX B-8 at 40-42.) Plaintiff testified that he asked her if she would accept his application, and Bone told him "that she would pass it on to Ms. Velvet." (*Id.* at 42-43.) According to plaintiff, he "handed Andrea Bone [his application]." (*Id.* at 39.) For purposes of this motion, drawing reasonable inferences in favor of the nonmovant, plaintiff's testimony establishes that his application timely reached the Personnel Office. (*Id.* at 40-41.) Plank's testimony establishes that when a personnel specialist assigned to a job announcement is absent an application may be left with another personnel specialist. (PX D-8 at 29, D-9 at 30.) However, plaintiff's version of the facts evidences no reprisal, because there is no evidence of a causal connection between plaintiff's EEO activity and the fact that plaintiff's application reached the Personnel Office, but did not reach the personnel specialist handling the announcement prior to the selection. First, there is no evidence that Plank received the application in time for it to be considered. Second, there is no evidence that anyone intentionally prevented the application from reaching Plank in time for consideration. Assuming arguendo that some personnel employee mishandled plaintiff's application, there is no evidence indicating that it was intentional. Third, there is no evidence that anyone other than Bone and Robinson handled plaintiff's application before Plank was informed of its submission on August 6, 1994. Bone and Robinson's handling of the application cannot supply the requisite causal connection

19

because neither knew plaintiff or knew of his prior EEO activity at the time in question.  (*See*

Robinson Decl. ¶ 1; Bone Tobias Decl. ¶ 2.)  Thus, there is no evidence of a causal connection

between plaintiff's prior EEO activity and the handling of his application for Position 2.

Plank is the only personnel specialist involved with this announcement who had

knowledge of Plaintiff's prior protected activity.  (*See* PX D-3 at 7, 8.)  However, Plank's

testimony that he first learned of plaintiff's application on September 6, 1994, a week after the

job selection had been made, is undisputed.  (*See* Plank Decl. ¶¶ 2, 4.)  It is undisputed that Ehl

made the job selection on August 31, 1994.  (*See* Ehl Decl. at ¶ 2, Ex. A.)  Although Plank knew

of plaintiff's EEO activity, there is no evidence by which a reasonable jury could infer that he

knew of plaintiff's application at any time before Ehl's August 31, 1994, selection of Shivers.

Therefore, there is no evidence by which a reasonable jury could infer that Plank took any steps

to prevent plaintiff's application from being considered.

The Personnel Office did not discover any irregularities concerning plaintiff's application

until after the selection had occurred.  Plaintiff has presented no evidence of any policy or

practice of stopping the selection process after the selection has been made and announced as

filled.  Although plaintiff cites the Federal Personnel Manual,[19] assuming that the provided

provision was valid and applicable here, his citations do not support any finding of error in the

process.

There is no evidence to dispute the fact that Bynum's involvement in this situation was

limited to authoring two letters in the November/December 1994 time-frame, well after the

---

[19]In conjunction with the National Performance Review headed by Vice President Gore, on
January 27, 1994, James King, then Director of the Office of Personnel Management, abolished
the 10,000 page Federal Personnel Manual. *See* www.npr.gov/library/rtable/vol1no1.html.

selection had been made.  There is no evidence suggesting that Bynum was involved in any aspect of the Personnel Office's handling of plaintiff's application for Position 2.  Although Bynum knew of plaintiff's EEO activity, (PX S-4), there is no evidence that he knew that plaintiff applied for Position 2 until after the selection was made.

Although Plank testified that he thought that other personnel specialists were aware of plaintiff's EEO activity, (PX D-3 at 8-9), this testimony is inadmissible because there is no evidence "sufficient to support a finding that the witness has personal knowledge of the matter," FED. R. EVID. 602.  There is no evidence indicating that Plank had personal knowledge concerning what other personnel employees knew about Hollich prior to the fall of 1994.

There is also no evidence indicating that the Safety Office was involved in the misplacement of plaintiff's application.  According to plaintiff, such a suggestion "would be a little stretch."  (DX B at 49.)

Citing *Joshi v. Florida State Univ. Health Ctr.*, 763 F.2d 1227 (11th Cir. 1985), plaintiff argues that the Eleventh Circuit has rejected defendant's articulated reason for not selecting plaintiff as a matter of law.  (Pl.'s Opp'n at 16.)  However, the *Joshi* court considered a different situation than the case at hand presents.  In *Joshi*, the court held that defendant's attempt to rebut the female plaintiff's prima facie case of gender discrimination by showing that the males hired or offered the position were at least as qualified as she was was insufficient as a matter of law where plaintiff's qualifications were never actually compared to those of the male applicants.  *Id.* at 1235.  In contrast to the defendant in *Joshi*, the defendant in the instant case does not claim that the other applicants were more qualified than plaintiff, but rather that the selecting official did not have plaintiff's application and was not aware that plaintiff had applied for the position.

21

(Def.'s Mem. at 22.)  While in *Joshi*, the court concluded that some decision-makers knew that Joshi was an applicant, *Joshi*, 763 F.2d at 1235, in the instant case, there is no evidence that either Plank or Ehl was aware that plaintiff was an applicant.  "Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason."  *Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000).  Because there is no evidence to rebut defendant's articulated reason for not selecting plaintiff, defendant is entitled to judgment as a matter of law on Count 6.

### 3.  Count Ten

In Count Ten plaintiff alleges that he was not selected for Position 3 because of reprisal. (Compl. at ¶ 58.)  Plaintiff alleges that Ehl retaliated against him based upon his prior EEO activity in not selecting him for this position.  (DX B at 59.)  The court assumes for purposes of this motion that plaintiff can establish a prima facie case of retaliation.  There is no dispute that ultimately, this position was canceled.  According to Ehl, the position was canceled because "the needed tethered payload system safety expertise may not be required following the February 1996 flight of STS-75.  No follow-on tethered satellite missions have been identified."  (PX I-78.)  Plaintiff testified that he has no reason to believe that either of these statements was untrue. (DX B at 59.)

Plaintiff contends that, because the job selection was cancelled, his opportunity for priority consideration was "meaningless."  (Pl.'s Opp. at 28.)  Ehl considered plaintiff for this position in June 1995 but decided not to select him.  (PX I-75, I-79.)  If Ehl had selected plaintiff during the priority consideration process in June 1995, he would have been placed in the position

within about four to six weeks.  (Hightower Decl. ¶ 2.)  Should the position have been abolished

thereafter, MSFC would have been obligated to place plaintiff in another position as a GS-14.

(*Id.* ¶ 3.)  Therefore, Position 3's elimination did not render plaintiff's priority consideration

meaningless.

      Plaintiff also contends that the priority consideration Ehl actually afforded him was

meaningless because Ehl considered only plaintiff's personnel file.  (Pl.'s Opp'n at 28.)  When

considering plaintiff for Position 3, Ehl made use of plaintiff's personnel file, but also had

plaintiff's complete application.  (PX E-18 at 68, 69.)  Plaintiff discusses at length the

"knowledge, skills, abilities and other characteristics to be used in the evaluation of candidates"

("KSAOCs") listed when the position was announced for competition and argues that Ehl should

have considered them when affording plaintiff priority consideration.  (Pl.'s Opp'n at 18-20; *see*

PX I-45.)  Plaintiff submitted a KSAOC Supplemental Application for this position, (*see* PX I-

69), but Ehl did not consider it, (PX E-19 at 72).  However, there is no evidence that any

selecting official reviewed the KSAOC Supplemental Application of any applicant for this

position.  Assuming arguendo that the cited evidence somehow demonstrates that plaintiff was

better qualified than the other (non-selected) applicants, plaintiff cannot prove pretext by simply

showing that he was better qualified than other applicants.  *Lee v. GTE Florida, Inc.*, 226 F.3d

1249, 1253 (11th Cir. 2000).

      Plaintiff's contends that Personnel should have sent more information to Ehl as selecting

official and/or that Ehl should have solicited more information from Personnel or plaintiff

himself.  (DX B at 59-61.)  However, plaintiff has identified no failure on the part of Ehl or

anyone else to comply with Crawford's instruction letter or the NASA Handbook's instructions

on priority consideration.  Plaintiff's contention that the priority consideration process could have and should have been conducted differently provides no indicia of retaliation by Ehl or anyone else.

Ehl's contemporaneous notes summarizing his review of Plaintiff's Official Personnel File clearly state legitimate, non-discriminatory reasons for not selecting plaintiff during the priority consideration process.  Ehl noted that plaintiff was a GS-12 at the time he worked in the Safety Office, that he was promoted to a GS-13 on February 17, 1985, and that he had no experience at the 13 level on any safety aspect since he was reassigned to S&E at that time.  (PX I-79.)  Hollich's Official Personnel File confirms these statements with one exception:   plaintiff worked for ten days as a GS-13 in the Safety Office.  (Plank Decl. ¶ 13, Exs. K, L.)  Otherwise, the information in the Official Personnel File substantiates Ehl's conclusion.

Ehl next noted that plaintiff's performance was essentially satisfactory while working in the Safety Office.  (PX I-79.)  During the time period at issue, there were five levels for performance evaluations of MSFC GS/GM employees: two lower levels followed by fully successful, highly successful, and outstanding.  (Plank Decl. ¶ 15.)  Plaintiff acknowledged that he was never rated higher than fully successful, the middle level, while employed at MSFC.  (*See* DX B at 78.)  Plaintiff 's own testimony confirms Ehl's description of Plaintiff's performance as essentially satisfactory.

Ehl then noted that the experience disclosed in the 201 file (another reference to the Official Personnel File) had marginal application to the position and that Plaintiff had free-flying experience only, with no tether experience.  (PX I-79.)  Position 3's duties included serving as technical expert and authority on tethered space flight systems.  (*See* PX I-45.)  In response to a

24

specific request from defendant, plaintiff produced no evidence documenting tether experience. (DX B, Ex. 4 ¶ 6.) Plaintiff has pointed to no documents in his Official Personnel File documenting tether experience. (*Id.*) Ehl's conclusion that there is no information in the Official Personnel File documenting tether experience is undisputed.

Finally, Ehl noted that plaintiff had no experience in the Space Shuttle flight readiness process including launch countdown support. (PX I-79.) During discovery, defendant asked plaintiff to produce any documents he had or had access to that documented his experience in the Space Shuttle flight readiness process including launch countdown support. (DX B, Ex. 4 ¶ 7.) In response, plaintiff produced a document that appears to be a draft position description with no indication that it was ever officially approved. (*See id.*) This draft document provides no evidence that plaintiff had experience in the Space Shuttle flight readiness process including launch countdown support. Plaintiff has failed to provide any evidence that Ehl's articulated reasons for not selecting him were pretextual.

Plaintiff criticizes many aspects of the priority consideration process: Ehl should have had plaintiff's KSAOC Supplemental Application, a "standard application" from Plaintiff, and a supervisory evaluation of plaintiff's KSAOCs; Ehl should have interviewed plaintiff; plaintiff should have been advised that Ehl "was going to consider him under priority consideration for the position"; and Ehl should have had plaintiff's performance reviews. (Pl.'s Opp'n at 23-25, 29.) There is a false premise underlying these arguments: that plaintiff should have received the same consideration for this position as the applicants who pursued the position through the competitive placement process. (*Id.* at 24.) The priority consideration process is an exception to NASA-MSFC's Competitive Placement Plan. (*See* DX I, Ex. 17 at 2-3.) There is no evidence

that the priority consideration procedures are governed by the same rules as the competitive placement procedures. Plaintiff can point to an indefinite number of ways in which he would have conducted the priority consideration process differently. However, he has failed to point out any departure from NASA-MSFC's guidelines on priority consideration.

In order to prove his qualifications for the position, plaintiff cites considerable evidence by which he hopes to call Ehl's judgment of his qualifications into question. For example, plaintiff refers to his own KSAOC Supplemental Application dated August 17, 1995, (*see* PX I-69), and Hollich's November 20, 2000, Affidavit, (*see* ES A-2). (Pl.'s Opp'n at 21.) Even if this evidence demonstrated that Ehl's assessment of plaintiff's qualifications was incorrect it is not relevant to the issue of pretext because the evidence did not exist when Ehl made his decision in June 1995. These documents provide no basis for concluding that Ehl did not afford plaintiff meaningful priority consideration.

Plaintiff refers to two documents that predate the June 26, 1995, priority consideration: a flow chart, (PX A-4), and a draft position description, (PX A-6). (Pl.'s Opp'n at 21.) Because there is no evidence that the flow chart was ever in plaintiff's personnel file, it is irrelevant. As to the "position description," to quote United States Magistrate Judge Paul Greene:

> . . . Mr. Hollich testified that when he left the Safety Office in 1985, he was given systems safety responsibility at the direction of Mr. Crumbley in the Integration Laboratory. He identified a "position description" describing an AST Flight Systems Safety Aerospace Engineering GS-861-12 as having been provided to him by Mr. Crumbley as his job description. (Plaintiff's Exhibit # 23). The exhibit clearly indicates that it is in fact Flight Systems Safety oriented. Mr. Crumbley testified, however, that he did not recall giving the position description to Mr. Hollich. He did not recognize the document. Both Robert Crumbley and the Director of the Personnel Office noted that the position description indicating Flight Systems Safety functions performed by Mr. Hollich after his transfer to the Integration Laboratory was not a "official" position statement in that it did not bear an official classification, an approval signature nor position number. Ms.

26

> Vicki Crawford, an employee with MSFC's personnel office for thirty-two years,
> testified the document (Plaintiff's Exhibit #23) appeared to be a draft. Mr.
> Crumbley further testified that he would not have had Mr. Hollich who was then a
> GS13 performing GS12 functions as indicated in Plaintiff's Exhibit #23. . . .[20]

(DX O at 31.)  This document does not evidence pretext.

Plaintiff contends that "several aspects" of the priority consideration process demonstrate arguable pretext. (Pl.'s Opp'n at 22.)  Plaintiff relies on Plank's testimony that to his knowledge no job selections were made solely on the basis of the personnel file. ( *Id.* at 23; *see* PX D-20 at 74.)  However, Plank also testified that he had "never been involved in priority consideration . . . ." (DX F at 70.)  Therefore, Plank's testimony is not indicative of pretext.

Plaintiff refers to Plank's testimony that performance appraisals are not in personnel files, (PX D-22 at 84), and argues that "Plank's testimony is in direct contradiction to what Ehl claims was in Hollich's 201 file." (Pl.'s Opp'n at 23.)  Ehl, however, testified that he did not specifically recall whether plaintiff's performance appraisals were in the personnel file or whether they were provided in an adjunct folder; however, to the best of his recollection, he saw them. (DX C at 33.)  Ehl noted that plaintiff's performance was essentially satisfactory while working in the Safety Office. (*Id.*; DX I, Ex. 31.)  Because plaintiff's testimony corroborates Ehl's conclusion, (*see* DX B at 78), there is no basis to infer that Ehl's assessment is incorrect or that it lacks a proper factual foundation.  Because Ehl articulated a clear and reasonably specific factual basis upon which he based his opinion, his reasons are valid whether classified as objective or subjective. *See Chapman*, 229 F.3d at 1034.

---

[20]Plaintiff's current submission blacks out the "GS-861-12," showing that this was a draft job description for a grade 12 position, as noted by Judge Greene. (PX A-6.)

27

Plaintiff argues that Ehl's failure to "consider Hollich for priority consideration when he had the full information packet from Hollich [on August 22, 1995]" is evidence of pretext. (Pl.'s Opp'n at 25.) However, by that time Hollich had already been afforded priority consideration. Priority consideration occurs "before other candidates are considered under these competitive procedures." (DX I, Ex. 17 at 2-3.) The announcement opened competition for the announced vacancy on August 4, 1995. (*Id.,* Ex. 24.)

Plaintiff also relies on the testimony of Charles Scales, Equal Opportunity Officer at MSFC. (Pl.'s Opp. at 25.) Scales was tendered as a Rule 30(b)(6) witness to testify "[w]ith respect to the procedure for providing priority consideration to employees who have EEO actions that have been mishandled." (DX H at 10-11.) Because plaintiff had no EEO action that had been mishandled with priority consideration being afforded, Scales's testimony is irrelevant. Plaintiff's priority consideration came out of the Competitive Placement Process administered by Personnel, not the EEO process. Scales testified that he was not familiar with the NASA Competitive Placement Plan which was the sole basis for the priority consideration afforded plaintiff. (*Id.* at 16.) Plaintiff's statement that "Mr. Scales clearly testified what NASA would expect of the selecting official in providing priority consideration," (Pl.'s Opp'n at 25), is unsupported by the record.

## D. Count Five

In Count Five plaintiff alleges that he was not selected for Position 2 because of age discrimination. (Am. Compl. ¶ 44.) The court is of the opinion that defendant is entitled to judgment as a matter of law on this claim.[21] Plaintiff may establish disparate treatment under the

---

[21] Plaintiff concedes that Count Five is due to be dismissed. (Pl.'s Opp'n at 1.)

ADEA by presenting direct evidence of discrimination, through statistical proof, or by presenting circumstantial evidence of discrimination. Plaintiff does not contest defendant's assertions that there is no direct evidence of discrimination as to plaintiff's non-selection for Position 2 and that there is no statistical evidence that is relevant to this non-selection. (*See* Def.'s Mem. at 25, 26.) To establish a prima facie case of discrimination by circumstantial evidence, plaintiff must show that he was a member of a class protected by the ADEA, that he was denied a promotion for which he applied and was qualified, and that a substantially younger employee who was equally or less qualified than plaintiff received the position. *See Chapman*, 229 F.3d at 1043. Once plaintiff establishes a prima facie case, the burden shifts to defendant to articulate a legitimate, nondiscriminatory reason for not selecting plaintiff for the position. *Id.* If defendant does so, then the burden shifts back to plaintiff to proffer evidence showing that the reasons offered by defendant were pretextual. *Id.* Assuming a prima facie case, defendant has articulated a legitimate reason for not selecting Hollich: the selecting official did not have his application and was not aware that he had applied for the position. (Def.'s Mem. at 22.) Hollich has presented no evidence by which a reasonable jury could infer that defendant's articulated reason is pretextual. Count Five is due to be dismissed.

## CONCLUSION

For the reasons set forth above, the court dismissed Counts Two through Twelve of plaintiff's Amended Complaint. The Orders dismissing these claims were previously entered..

DONE this 30ᵗʰ day of September, 2003.

*Sharon Lovelace Blackburn*

**SHARON LOVELACE BLACKBURN**
United States District Judge